# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RODNEY JOHNSON,<br><br>         Petitioner,<br><br>     vs.<br><br>G. J. GIURBINO,<br><br>         Respondent. | 1:03-cv-06013-LJO-TAG HC<br><br>FINDINGS AND RECOMMENDATIONS TO DENY PETITION FOR WRIT OF HABEAS CORPUS (Doc. 1)<br><br>ORDER DIRECTING THAT OBJECTIONS BE FILED WITHIN TWENTY DAYS |

Petitioner is a state prisoner proceeding pro se and in forma pauperis with a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.

## PROCEDURAL HISTORY

Petitioner is in custody of the California Department of Corrections and Rehabilitation as a result of conviction in the Superior Court of California, County of Stanislaus (the "Superior Court") of second-degree robbery (Cal. Pen. Code § 211), with "true" findings regarding enhancements pursuant to Penal Code § 12022.53(b) (personal use of a firearm) and Penal Code § 667.5(b)(prior prison term).  (Clerk's Transcript on Appeal ("CT") 102).   Petitioner was sentenced to the upper term of five years on the substantive robbery conviction, enhanced by a ten-year sentence for the personal use of a firearm and by a sentence of one year for the prior prison term, for an aggregate sentence of sixteen years.  (Id.).

On August 7, 2000, Petitioner filed a direct appeal in the California Court of Appeals, Fifth Appellate District (the "5th DCA"). (Doc. 18 , Exh. A).   On January 4, 2001, the 5th DCA

affirmed Petitioner's conviction in an unpublished opinion.  (Id., Exh. D).   Petitioner timely filed

a petition for review in the California Supreme Court.  On July 10, 2001  (Id., Exh. E), which

was denied on August 15, 2001.  (Id., Exh. F).

On December 12, 2002, Petitioner filed a petition for writ of habeas corpus in the

Stanislaus County Superior Court.  (Doc. 18, Exh. G).  The petition was denied on January 31,

2003.  (Doc. 18, Exh. H).  It appears that Petitioner then filed a reply to the Attorney General's

informal response on February 14, 2003, thus prompting the Superior Court to reconsider its

ruling in a minute order dated February 18, 2003.  (Doc. 21, p. 3).  In so doing, the Superior

Court reached the same result, denying "the writ on all grounds alleged for the same reasons

delineated in the Court's previous denial in its January 31, 2003 minute order."  (Id.).   On March

27, 2003, Petitioner filed a habeas petition in the 5th DCA (Doc. 18, Exh. I), which was denied

on April 10, 2003.  (Doc. 18, Exh. J).

Thereafter, the record in this case becomes somewhat confused.  Respondent, in exhibits

attached to his response to the petition, indicates that on June 2, 2003, Petitioner filed his habeas

petition in the California Supreme Court (Doc. 18, Exh. K) and that this petition was denied on

July 9, 2003.  (Doc. 18, Exh. L).   Petitioner, on the other hand, claims that the "Rodney

Johnson" referred to in Exhibits K and L is a different individual who was appealing a conviction

from the Second Appellate District in Los Angeles.  (Doc. 21).  Indeed, Petitioner has submitted

a letter sent by the California Supreme Court to Petitioner, inexplicably dated June 22, 1998,

which notified Petitioner that the Supreme Court was returning unfiled his petition for review,

which had been received by the high court on May 30, 2003.  (Doc. 21, Exh. C).  The letter

indicated that the Court lacked jurisdiction because the petition for review had been filed beyond

the jurisdictional period provided for in the California Rules of Court and that the deadline for

filing had expired on May 12, 2003.  (Id.).  Apart from the discrepancy in the date of the letter, it

otherwise appears correct in that it references the correct docket number for Petitioner's habeas

petition in the 5th DCA and also correctly references the date the 5th DCA denied the petition.

An independent review by this Court of the official electronic database for the California

Courts indicates that one Rodney Johnson did indeed file a Petition for Review in the California

1   Supreme Court on June 2 2003, on a petition for writ of habeas corpus from Division Three of

2   the 2nd DCA's denial of his petition in case no. B166994.  The Court's docket further indicates

3   that the petition for review was denied on July 9, 2003, which coincides with the date in Exhibit

4   L.  It appears that these state habeas proceedings arose from a conviction which was appealed on

5   March 28, 2002, in case no. B157441, at a time when Petitioner would have been incarcerated on

6   the instant conviction.  Further, the signatures in Exhibit K and those of Petitioner in this case

7   bear no resemblance at all.

8          Thus, it appears that Respondent's Exhibits K and L refer to a different Rodney Johnson

9   than Petitioner, and that the state habeas petition that Petitioner filed in the California Supreme

10  Court was not denied on July 9, 2003, but instead was returned to him unfiled sometime after

11  May 30, 2003, the date Petitioner apparently submitted his petition.  The "other" Rodney

12  Johnson appears to have filed his petition for review in the California Supreme Court three days

13  later on June 2, 2003.  While such a rare coincidence does not excuse the apparent confusion that

14  ensued on the part of Respondent and the California Supreme Court, for the reasons expressed

15  infra, the confusion, while extraordinary, has no legal bearing on the outcome of this case.

16         On July 28, 2003, Petitioner filed the instant petition.  (Doc. 1).  On December 28, 2004,

17  Respondent filed a response to the petition.  (Doc. 18).  Petitioner has not filed a traverse.

18  Respondent concedes that Petitioner has exhausted Ground One, but no others.  (Doc. 18, p. 2).

19                                    **FACTUAL BACKGROUND**

20         On December 11, 1999, at approximately 7:20 in the morning, Norma Cortez was

21  working at a gas station located at Carver and Orangeburg in Modesto, California, doing

22  paperwork, when a person she later identified as Petitioner approached her with his hand in his

23  jacket.  (Reporter's Transcript ("RT") 38).  His right hand was near his waist and close to his

24  body.  (Id.).  Petitioner was approaching quickly and this scared Cortez.  (RT 39).  At the time,

25  Cortez was helping her only customer, Darcy Ashby.  (RT 40).  Petitioner told Ashby to go

26  ahead; Cortez assumed this was because she was going to be robbed and that Petitioner did not

27  want witnesses.  (RT 40).

28  ///

1    After Ashby left, Petitioner pulled out a gun and placed it on the counter, telling Cortez,

2    "give me all the money." (RT 41). Cortez said, "Oh, no, please." (RT 59). She then began to

3    pull out money from her cash drawer, giving Petitioner only two dollars or so at a time, but

4    Petitioner said, "Hurry up. Get the 20's." (RT 41, 59).

5    The gun was a small-caliber silver handgun. (RT 42). Petitioner kept asking for more

6    money, but Cortez finally closed the money drawer and said, "Just take that and leave." (RT 43).

7    Petitioner picked up the money and walked toward a green station wagon. (Id.). Cortez was able

8    to see part of the car but not the license plate. (RT 44). Ashby, however, the lone customer,

9    apparently realized that a robbery was taking place. (RT 44). When Ashby returned to sign his

10   credit card slip, Cortez's hands were shaking so much she could not write down the license

11   number. (Id.). So Ashby ran toward the car and wrote down the license number. (RT 44- 45).

12   Cortez testified that there was another person in the station wagon, the driver, but she

13   could not see the person clearly. (RT 45). Cortez, however, had a good look at the robber and

14   was "confident" at trial that Petitioner was the man who robbed her. (RT 44).   She dialed "911"

15   and the police arrived within ten minutes. (RT 45). She gave a description of the suspect to the

16   officers. (RT 46). Later that afternoon, she was taken to see the Petitioner, who had been

17   arrested, and was asked if Petitioner was the robber. (RT 45, 49). She told the officers that

18   Petitioner was the man who had robbed her. (Id.).

19   Ashby testified that he was a regular customer of the gas station where Cortez worked.

20   (RT 70). As he went to pay Cortez, he noticed a man approaching the cashier at the same time.

21   (Id.). The man had his right hand inside a jacket and motioned for Ashby to come forward with

22   his left hand. (Id.). Ashby approached the window and was handing Cortez the credit card when

23   he noticed a shiny gun barrel inside the man's jacket. (Id.).

24   As Ashby paid, the man backed away. (RT 71). Ashby then went back behind one of the

25   gas pumps and saw the man standing at the cashier's window with his right hand still inside his

26   jacket. (RT 71). Cortez was handing the man cash through the window. (Id.). When the man

27   left, Ashby went to Cortez and asked, "You just got robbed, didn't you?" (Id.). Cortez said

28   "Yes, I did." (Id.). As Cortez called 911, Ashby ran in the direction of the station wagon to get

4

1   the license number, then went back to Cortez and wrote it down for her. (RT 71-72). Ashby

2   testified he told officers he was "sure" about the license number. (RT 72).

3        Ranetta Wiggins testified that on December 11, 1999, she drove a green Honda station

4   wagon to Cortez's gas station at about 7:20 in the morning. (RT 79-80). Petitioner was a

5   passenger in Wiggins's car. (RT 79). That morning, Wiggins had gone to the Paradise

6   Apartments and had seen Sheila, a friend of hers, talking to Petitioner. (RT 80). Petitioner said

7   he needed to get to his wife's house to get some money and asked Wiggins for a ride. (Id.).

8   Petitioner offered to buy Wiggins a couple of dollars worth of gas if she would drive him to his

9   wife's house. (Id.). He also offered Wiggins some liquor. (Id.).

10        Petitioner directed Wiggins to a store, but the store was not open. (RT 82). Petitioner

11   then started to urinate on the side of the building and Wiggins, not wanting to watch, pulled her

12   station wagon up farther. (RT 82). After that, she saw Petitioner go up to the gas station

13   window. (Id.). Wiggins could only see Petitioner's back; she could not see what he was doing.

14   (RT 83). Wiggins thought perhaps he was buying cigarettes. (Id.). Petitioner returned to the car

15   and got inside. (Id.). As he got in, Wiggins noticed he had a wad of bills in his hand. (Id.).

16        Wiggins instantly realized Petitioner had robbed the station attendant and began to shout,

17   "Oh, my god. Oh, my god. What have you done? What did you do?" (RT 84). Petitioner

18   opened his jacket and took out the gun and said, "Calm down, calm down." (Id.). Petitioner then

19   told Wiggins to drive away. (Id.). Wiggins tried to calm herself and Petitioner said, "I want you

20   to pull out of the driveway and make a left here and drive as calmly as you can and stay calm and

21   take me back to where you got me." (RT 85). Wiggins agreed only because Petitioner had a

22   gun; otherwise, she would have gotten out of the car. (RT 85). Wiggins drove Petitioner back

23   to the Paradise Apartments. (Id.).

24        When they arrived, Petitioner told Wiggins, "You're with me till I say you're not with

25   me." (RT 86). Wiggins understood this to be a threat and she got out of the car with Petitioner.

26   (Id.). Petitioner then took the sleeve of the jacket he had on and began wiping the dashboard and

27   door handle inside and out. (RT 87). She then went with Petitioner to an apartment where, once

28   inside, Petitioner began "ranting and raving" at the people there and waved his gun around. (Id.).

Petitioner took Wiggins back outside the apartment, where a woman came up and hugged him. (RT 88). Petitioner hugged the woman back and then he turned to Wiggins, and looking "mean," said, "Our business is finished. Leave now." (RT 89). Wiggins got back in her car and drove away crying. (RT 89). Finally, Wiggins called her husband, who told her to come home and call police. (RT 90). When she got home, she immediately called 911. (RT 91). While she was on the phone, police arrived with drawn weapons. (RT 91). Wiggins was taken to a police station in handcuffs and gave a complete description of Petitioner. (RT 92; 94). Later, she was able to identify Petitioner for police. (RT 92). Wiggins had spent an hour or hour and one-half with Petitioner and she was "sure" Petitioner was the man she had encountered. (RT 93). She testified she would "never forget" his eyes. (RT 121). Asked again by the prosecutor, Wiggins stated she was "absolutely positive" that Petitioner was the man she had met. (RT 124). When asked to place a percentage on the degree of certainty of her identification, she replied, "I would say one hundred percent." (Id.).

Scott Myers, a Modesto Police officer, testified that he transported Wiggins to several locations in an attempt to conduct an in-field lineup or show-up of possible suspects. (RT 127). First, however, he read Wiggins several admonishments on two occasions. (RT 127). The admonishments advised her that the subject she would see may or may not be involved in criminal activity but that it was just as important to exclude suspects as identify them. (Id.). She "ruled out" the first person she was asked to identify, but was "one hundred percent certain" about the second suspect, who was Petitioner. (RT 128; 132-133). Wiggins made her identification of Petitioner "immediately." (RT 134).

## DISCUSSION

### I. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the

1  Superior Court for the County of Stanislaus, which is located within the jurisdiction of this court.

2  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).  Accordingly, the Court has jurisdiction over this

3  action.

4        On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

5  (the "AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

6  Lindh v. Murphy, 521 U.S. 320 (1997);  Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997),

7  overruled on other grounds by Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only

8  applicable to cases filed after statute's enactment).  The original petition was filed on July 28,

9  2003, after the enactment of the AEDPA, and thus it is governed by the AEDPA.

10       **II.  Legal Standard of Review**

11        A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

12  the adjudication of a prisoner's claim (1) "resulted in a decision that was contrary to, or involved

13  an unreasonable application of, clearly established Federal law, as determined by the Supreme

14  Court of the United States" or (2) resulted in a decision that "was based on an unreasonable

15  determination of the facts in light of the evidence presented in the State court proceeding."

16  28 U.S.C. § 2254(d);  Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);  Williams v. Taylor,

17  529 U.S. at 412-413.

18        The first prong of federal habeas review involves the "contrary to" and "unreasonable

19  application" clauses of 28 U.S.C. § 2254(d)(1).  This prong pertains to questions of law and

20  mixed questions of law and fact.  Williams v. Taylor, 529 U.S. at 407-410;  Davis v. Woodford,

21  384 F.3d 628, 637 (9th Cir. 2004).  A state court decision is "contrary to" clearly established

22  federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme

23  Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a

24  [Supreme Court] decision but reaches a different result."  Brown v. Payton, 544 U.S. 133, 141

25  (2005)(citing Williams v. Taylor, 529 U.S. at 405).  A state court decision involves an

26  "unreasonable application" of clearly established federal law "if the state court applies [the

27  Supreme Court's precedents] to the facts in an objectively unreasonable manner."  Brown v.

28  Payton, 544 U.S. at 141.  Consequently, a federal court may not grant habeas relief simply

1  because the state court's decision is incorrect or erroneous; the state court's decision must also be

2  objectively unreasonable.  Wiggins v. Smith, 539 U.S. 510, 511 (2003)(citing Williams v.

3  Taylor, 529 U.S. at 409).  Section 2254(d)(1)'s reference to "clearly established Federal law"

4  refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time

5  of the relevant state-court decision."  Williams v. Taylor, 529 U.S. at 412; Lockyer v. Andrade,

6  538 U.S. at 412; Barker v. Fleming, 423 F. 3d 1085, 1093 (9th Cir. 2005).

7        The second prong of federal habeas review involves the "unreasonable determination"

8  clause of 28 U.S.C. § 2254(d)(2).  This prong pertains to state court decisions based on factual

9  findings.  Davis v. Woodford, 384 F.3d at 637(citing Miller-El v. Cockrell, 537 U.S. 322

10 (2003)).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's

11 adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable

12 determination of the facts in light of the evidence presented in the State court proceeding."

13 Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500 (when reviewing a state

14 court's factual determinations, a "responsible, thoughtful answer reached after a full opportunity

15 to litigate is adequate to support the judgment").  A state court's factual finding is unreasonable

16 when it is "so clearly incorrect that it would not be debatable among reasonable jurists."  Id. ; see

17 Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543

18 U.S. 1038 (2004).  The AEDPA also requires that considerable deference be given to a state

19 court's factual findings. A state court's factual findings are  presumed to be correct, and the

20 presumption may be rebutted only by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

21       To determine whether habeas relief is available under § 2254(d),  the federal court looks

22 to the last reasoned state court decision as the basis of the state court's decision.  Robinson v.

23 Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court decided the petitioner's

24 claims on the merits but provided no reasoning for its decision, the federal habeas court must

25 independently review the record to determine whether habeas corpus relief is available under

26 § 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d

27 976, 981-982 (9th Cir. 2002).  Where the state court denied the petitioner's claims on procedural

28 grounds or did not decide them on the merits, the deferential standard of the AEDPA does not

apply and the federal court must review the petitioner's 's claims de novo.  <u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1167 (9th Cir. 2002).-

### III.  <u>Grounds Two, Three, and Four Are Procedurally Barred</u>

Respondent contends that Petitioner's claims in Grounds Two, Three, and Four are procedurally barred from federal habeas review because they were not raised on direct appeal. <u>Ex parte Dixon</u>, 41 Cal.2d 756, 759 (1953).   (Doc. 17, p. 3).  The Court agrees.

A federal court will not review claims in a petition for writ of habeas corpus when the state court denied relief on those claims based on a state procedural law that is both independent of federal law and adequate to support the judgment.  <u>Ylst v. Nunnemaker</u>, 501 U.S. 797,  801 (1991);  <u>Coleman v. Thompson</u>, 501 U.S. 722, 729-730 (1991).  "A district court properly refuses to reach the merits of a habeas petition if the petitioner defaults on the particular state's procedural requirements and is unable to demonstrate cause and prejudice or a fundamental miscarriage of justice."  <u>Park v. California</u>, 202 F.3d 1146, 1150 (9th Cir. 2000).  This doctrine of procedural default is based on concerns of comity and federalism.  <u>Coleman</u>, 501 U.S. at 730-732.

The mere occurrence of a procedural default will not necessarily bar a federal court from reviewing claims in a petition for writ of habeas corpus.  For the procedural default doctrine to apply and thereby bar federal review, the state court must also "'clearly and expressly' state that its judgment rested on a state procedural bar."  <u>Harris v. Reed</u>, 489 U.S. 255, 263 (1989), citing <u>Caldwell v. Mississippi</u>, 472 U.S. 320, 327 (1985)(quoting <u>Michigan v. Long</u>, 463 U.S. 1032, 1041 (1983)).

1. <u>State Law Procedural Ground - the Dixon Rule</u>

The first step in deciding whether there has been a procedural default is to determine whether the state court clearly and expressly denied relief on a state procedural ground.  Here, Petitioner pursued a direct appeal, but raised only Ground One and did not raise the remaining three issues contained in his federal habeas petition.  (Doc. 18, Exh. A).  Rather, Petitioner presented those three claims to the Superior Court for collateral review in a petition for writ of habeas corpus in the Superior Court for the County of Stanislaus.  (Doc. 18, Exh. G.)  The

1    Superior Court denied Petitioner's habeas petition on January 31, 2003, finding that "petitioner

2    failed to raise any of the above four (4) issues on appeal, although he has not demonstrated why

3    he failed to do so.  For this reason also, the Court DENIED the writ on all grounds alleged."

4    (Doc. 18, Exh. H, p. 2).

5         Respondent correctly notes that the Stanislaus County Superior Court's ruling denying

6    Petitioner's state habeas petition is premised on the rule articulated in Ex parte Dixon, which

7    provides that:

8              The general rule is that habeas corpus cannot serve as a substitute for an appeal,
               and, in the absence of special circumstances constituting an excuse for failure to
9              employ that remedy, the writ will not lie where the claimed errors could have
               been, but were not, raised upon a timely appeal from the judgment of conviction.
10

11   Ex parte Dixon, 41 Cal. 2d at 759.  Pursuant to the Dixon rule, in a habeas corpus proceeding, a

12   California court will not review the merits of a claim if that claim could have been raised in a

13   timely appeal, but was not.

14        The 5th DCA denied Petitioner's subsequent habeas petition, also containing the same

15   claims, without citation or comment. (Doc. 18, Exh. J).   Assuming, arguendo, that Petitioner is

16   correct that the California Supreme Court returned his petition unfiled, without ruling on the

17   petition, either procedurally or on the merits (Doc. 21, Exh. C), then the last actual ruling on his

18   petition was the silent denial by the 5th DCA, which is deemed to have denied Petitioner's

19   claims for the same reasons stated in the decision of the Superior Court.  Ylst, 501 U.S. at  801,

20   803 (explaining that "Where there has been one reasoned state judgment rejecting a federal

21   claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the

22   same ground.").

23        As the last state court to give reasons for its judgment, the Superior Court denied the

24   petition unambiguously on state law procedural grounds, i.e., the Dixon rule.  The next step is to

25   determine whether the Dixon rule is both independent of federal law and adequate to support the

26   judgment. If it is, habeas relief is procedurally barred.  Thus, regardless of whether Petitioner or

27   Respondent is correct about the way in which the California Supreme Court denied the petition,

28   both were "silent" denials that require the Court to look to the last reasoned decision, i.e., the

1  decision of the Superior Court denying the petition in part because of the <u>Dixon</u> bar.

2          2. <u>Independence</u>

3          Even when a petitioner has violated a state procedural law, the procedural default

4  doctrine does not bar federal habeas relief unless the state procedural law is both independent of

5  federal law and adequate to support the judgment.  <u>Coleman</u>, 501 U.S. at 729-732, 735.  For a

6  state procedural rule to be independent of federal law, "the state law basis for the decision must

7  not be interwoven with the federal law."  <u>La Crosse v. Kernan</u>, 244 F.3d 702, 704 (9th Cir. 2001)

8  (citing <u>Michigan v. Long</u>, 463 U.S. at 1040-1041, and <u>Harris</u>, 489 U.S. at 265); <u>Morales v.</u>

9  <u>Calderon</u>, 85 F.3d 1387, 1393 (9th Cir. 1996)(quoting <u>Coleman</u>, 501 U.S. at 735).  A state law

10  ground is interwoven with federal law if "the state has made application of the procedural bar

11  depend on an antecedent ruling on federal law [such as] the determination of whether federal

12  constitutional error has been committed." <u>Park</u>, 202 F.3d at 1152 (quoting <u>Ake v. Oklahoma</u>,

13  470 U.S. 68, 75 (1985)).

14          The Ninth Circuit Court of Appeals determined that prior to 1998, the <u>Dixon</u> rule was not

15  independent of federal law.  <u>Park v. California</u>, 202 F.3d at 1162-1163.  In <u>Park</u>, the Ninth

16  Circuit reasoned that because a fundamental constitutional error exception to the <u>Dixon</u> rule

17  existed under state law, application of the <u>Dixon</u> rule necessarily involved consideration of

18  federal law issues and therefore was "interwoven with the federal law."  <u>Id.</u>  Two years earlier,

19  the California Supreme Court explicitly stated that it would no longer consider whether an error

20  alleged in a state petition constituted a federal constitutional violation.  <u>In re Robbins</u>, 18 Cal.4th

21  770, 811-812 & n. 32, 77 Cal. Rptr. 2d 153 (1998).  In making it clear that it would no longer

22  consider federal law in applying the <u>Dixon</u> rule and its exceptions, the California Supreme Court

23  stated:

24          [W]e shall, in this case and in the future, adopt the following approach as our
        standard practice: We need not and will not decide whether the alleged error
25          actually constitutes a federal constitutional violation.  Instead, we shall assume,
        for the purpose of addressing the procedural issue, that a federal constitutional
26          error is stated, and we shall find the exception inapposite if, based upon our
        application of state law, it cannot be said that the asserted error led to a trial that
27          was so fundamentally unfair that absent the error no reasonable judge or jury
        would have convicted the petitioner.

28

1   In re Robbins, 18 Cal. 4th  at  811-812 & n. 32.

2      In 2003, the Ninth Circuit decided that the California Supreme Court's denial of a  habeas

3   petition for untimeliness constituted an independent and adequate state ground barring federal

4   habeas relief:

5        [W]e respect the California Supreme Court's sovereign right to interpret its state
        constitution independent of the federal law.  Applying Robbins prospectively, we

6        affirm the district court's determination that the California Supreme Court's post-
        Robbins denial of [a] state petition for lack of diligence (untimeliness) was not

7        interwoven with federal law and therefore is an independent procedural ground.

8   Bennett v. Mueller, 322 F. 3d 573, 583 (2003). Thus, application of the untimeliness bar is now

9   independent of federal law.

10      Although Bennett did not involve the Dixon rule per se, its rationale applies with equal

11   force to a post-Robbins application of  the Dixon bar because the Dixon bar and the untimeliness

12   bar are both subject to analogous constitutional error exceptions and state court consideration of

13   post-Robbins applications of these bars no longer involves federal law. See La Crosse, 244 F.3d

14   at 707 n. 29; Bennett, 322 F.3d at 1583; In re Robbins, 18 Cal. 4th at 811-812 & n. 32.  Thus, the

15   Court concludes that a post-Robbins invocation of the Dixon rule is independent of federal law.

16      To determine whether the state court's application of the Dixon rule is independent of

17   federal law in this case, the Court must look at the state decision invoking the Dixon rule.  See

18   Bennett, 322 F. 3d at 582-583; Park 202 F.3d at 1153; La Crosse, 244 F. 3d at 707.  Here, the

19   Superior Court invoked the Dixon rule sub rosa when it denied Petitioner's habeas petition on

20   January 31, 2003 and again in its denial of Petitioner's motion for reconsideration on February

21   18, 2003.  (Doc. 18, Exh. H; Doc. 21, p. 3).  The California Supreme Court thereafter silently

22   denied Petitioner's same habeas claims on July 9, 2003.  (Doc. 18, Exh. L.)  Robbins was

23   decided on August 3, 1998.  Because the state court's application of the Dixon rule was "post-

24   Robbins" and therefore predicated only upon consideration of state law, it was independent of

25   federal law regardless of whether the Court looks at Petitioner's first or last state habeas petition.

26      3.  Adequacy

27      A state procedural rule on which the state relies to establish a procedural default must

28   also be "adequate to support the judgment."  Coleman, 501 U.S. at 735.  A state procedural law

1  is adequate to support the judgment when it is "well-established and consistently applied."

2  Bennett, 322 F.3d at 582 (citing Poland v. Stewart, 169 F. 3d 573, 577 (9th Cir. 1999)).  The

3  question of whether a state procedural default rule is well-established and  consistently applied is

4  determined when the actual default occurs, not when the state court applies its procedural rule to

5  bar the petitioner's claim.  Fields v. Calderon, 125 F.3d 757, 760-761 (9th Cir. 1997); Calderon

6  v. U.S. Dist. Court for the Eastern Dist. of California (Hayes), 103 F.3d 72, 75 (9th Cir.

7  1996)(relevant time to assess application of the Dixon rule is when petitioner "had an

8  opportunity to raise the claims on direct appeal").  See Calderon v. U.S. Distr. Court for the

9  Eastern Dist. Of California (Bean), 96 F.3d 1126, 1131 (9th Cir. 1996)(evaluating the Dixon rule

10 at the time petitioner filed a direct appeal).  Here, the relevant date is November 28, 2000, when

11 Petitioner filed his opening brief on direct appeal. (Doc. 18, Exh. A). Thus, the appropriate

12 inquiry is whether the Dixon rule was well-established and consistently applied as of November

13 28, 2000.

14             a.  Well-established

15     In Park, the Ninth Circuit analyzed California's procedural limitations on habeas corpus

16 claims, including the Dixon rule, and found that prior to 1993, they were  "undefined and

17 imprecise." Park, 202 F.3d 1151-1153. As a result, the Ninth Circuit determined that such state

18 procedural bars were neither well-established nor consistently applied prior to 1993. Id.  In its

19 analysis, the Ninth Circuit noted the California Supreme Court's decisions in In re Clark, 5 Cal.

20 4th 750 (1993) and In re Harris, 5 Cal.4th 813 (1993) and evaluated their respective impact upon

21 applications of the untimeliness rule and the Dixon rule:  "These decisions were intended to

22 'reestablish California's procedural rules governing state habeas petitions and clearly define and

23 limit the applicable exceptions.'" Park, 202 F.3d at 1151-52 (quoting Fields, 125 F.3d at 763-74).

24     The California Supreme Court decided both In re Clark and In re Harris on July 29, 1993.

25 In re Clark, 5 Cal.4th 750; In re Harris, 5 Cal. 4th 813. Thus, these decisions had been the law for

26 more than seven years when Petitioner's procedural default occurred on November 28, 2000.

27 The Dixon rule was established in 1953, when Ex parte Dixon was decided. Ex parte Dixon,

28 41 Cal. 2d 756. Given the longstanding tenure of the Dixon rule, and the California Supreme

1   Court's decisions "clearly defin[ing] and limit[ing] its applicable exceptions," the Court

2   concludes that the <u>Dixon</u> rule was well-established at the time of Petitioner's November 28, 2000

3   procedural default.  <u>Fields</u>, 125 F.3d at 763-764.

4                    b.  <u>Consistently Applied</u>

5          The Court next considers whether the <u>Dixon</u> rule was consistently applied at the time of

6   Petitioner's procedural default.  The Ninth Circuit established a burden-shifting process to

7   determine whether a state procedural rule is adequate:

8          Once the state has adequately pled the existence of an independent and adequate
           state procedural ground as an affirmative defense, the burden to place that defense
9          in issue shifts to the petitioner.  The petitioner may satisfy this burden by asserting
           specific factual allegations that demonstrate the inadequacy of the state procedure,
10         including citation to authority demonstrating inconsistent application of the rule.
           Once having done so, however, the ultimate burden is the state's."
11
    <u>Bennett</u>, 322 F.3d at 586.
12
           In his response to the petition, Respondent argues that "[t]he second, third, and fourth
13
    claims were not properly raised on direct appeal and were rejected by the superior court on this
14
    procedural ground.  The superior court's imposition of the procedural bar forecloses
15
    consideration of these claims in this federal proceeding."  (Doc. 18, p. 9).   Respondent's
16
    memorandum of points and authorities specifically identifies the defaulted claims and discussed
17
    the applicable rules regarding a <u>Dixon</u> default. (<u>Id.</u>, pp. 9-12).  Respondent has thus satisfied his
18
    initial burden of pleading the existence of an independent and adequate state procedural ground
19
    as an affirmative defense, and thereby shifted the burden to place that defense in issue to
20
    Petitioner.
21
           In order to meet his burden under <u>Bennett</u>, Petitioner need only assert specific factual
22
    allegations that demonstrate the inadequacy of the <u>Dixon</u> rule, including citations to authority
23
    demonstrating an inconsistent application of the <u>Dixon</u> rule as of November 2000.  <u>Bennett</u>, 322
24
    F.3d at 586.  Petitioner did not file a traverse or otherwise make any factual allegations
25
    demonstrating the inconsistent application of the <u>Dixon</u> rule. Thus, Petitioner did not respond to
26
    Respondent's procedural default allegation in any meaningful fashion.  (<u>Id.</u>)  Consequently,
27

28

                                              14

1  Petitioner has not met his burden of demonstrating inconsistent application of the <u>Dixon</u> rule.[1]

2  Thus, the Court concludes that Respondent has satisfactorily established that the state court's

3  application of the <u>Dixon</u> rule was an adequate state ground for rejection of Petitioner's claims.

4      4.  <u>Cause and Prejudice Exception</u>

5      If the respondent has asserted the procedural default doctrine in a timely and proper

6  fashion, and if the default provides an independent and adequate state procedural ground for

7  decision, the  petitioner is barred from raising the defaulted claims unless he can 1) excuse the

8  default by demonstrating *cause* for the default and *actual prejudice* as a result, *or* 2) show that

9  the case falls within the category of cases the Supreme Court has characterized as fundamental

10 miscarriages of justice.  <u>Harris</u>, 489 U.S. at 262; <u>Coleman</u>, 501 U.S. at 751.  Cause is a legitimate

11 excuse for the default.  <u>Thomas v. Lewis</u>, 945 F.2d 1119, 1123 (9th Cir. 1991).  Cause exists if

12 the petitioner can show that some objective factor external to the defense impeded efforts to

13 comply with the state's procedural rules. <u>Coleman</u>, 501 U.S. at 753; <u>Murray v. Carrier</u>, 477 U.S.

14 478, 488 (1986); <u>see</u> <u>McCleskey v. Zant</u>, 499 U.S. 467, 493 (1991).  Prejudice is a legitimate

15 excuse for the default.  <u>Thomas</u>, 945 F.2d at 1123.  Actual prejudice exists if the errors

16 complained of created more than a possibility of prejudice; they must have "worked to [the

17 petitioner's] *actual* and substantial disadvantage, infecting [the petitioner's] entire trial with error

18 of constitutional dimensions."  <u>United States v. Frady</u>, 456 U.S. 152, 170 (1982).

19     Here, Petitioner failed to show good cause for his failure to present his claims in his

20 direct appeal. The Court has reviewed the record and finds nothing to support a finding of good

21 cause. Likewise, Petitioner presents no argument for, and makes no showing of, actual prejudice.

22 As mentioned, Petitioner did not file a traverse and thus does not address the issue of procedural

23 default at all.

24 *///*

25

26      [1]  The same burden-shifting analysis and result applies to the question of whether the

27 <u>Dixon</u> rule was consistently applied at the time of Petitioner's default.  <u>Bennett's</u> burden-shifting
analysis assesses adequacy, and adequacy relates to whether the state law ground for decision is

28 "well-established and consistently applied."  <u>Bennett</u>, 322 F.3d at 583.

1    5. <u>Fundamental Miscarriage of Justice</u>

2    A petitioner who cannot show cause and prejudice for his procedural default can still

3    bring his claims in a federal habeas petition if he can demonstrate that failure to consider his

4    claims will result in a "fundamental miscarriage of justice." <u>Coleman</u>, 501 U.S. at 750. "[T]he

5    principles of comity and finality that inform the concepts of cause and prejudice 'must yield to

6    the imperative of correcting a fundamentally unjust incarceration.'" <u>Murray</u>, 477 U.S. at 495

7    (quoting <u>Engle v. Isaac</u>, 456 U.S. 107, 135 (1982)). A fundamental miscarriage of justice occurs

8    when "a constitutional violation has probably resulted in the conviction of one who is actually

9    innocent." <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995) (quoting <u>Murray</u>, 477 U.S. at 495-496);

10   <u>Boyd. v. Thompson</u>, 147 F. 3d 1124, 1127 (9th Cir. 1998).

11   Here, although Petitioner does challenge the eyewitnesses' identification of him as the

12   robber, thus implying that he is actually innocent of the crime for which he was convicted, as the

13   discussion <u>infra</u> demonstrates, the Court rejects Petitioner's claim that insufficient evidence of

14   robbery was presented. Indeed, the evidence of Petitioner's guilt was substantial and supported

15   by two solid eyewitness identifications. Thus, it does not appear to the Court that a

16   "constitutional violation has probably resulted in the conviction of one who is actually innocent."

17   <u>Schlup</u>, 513 U.S. at 327. Hence, Petitioner's implied claim of actual innocence does not rise to

18   the level of a "fundamental miscarriage of justice" sufficient to excuse the absence of cause for

19   the default, and the record here does not support such an inference.

20   Accordingly, for the reasons stated above, the Court finds that Respondent has timely and

21   adequately raised the procedural default doctrine, and Petitioner's claims in Grounds Two, Three,

22   and Four are procedurally barred from federal habeas review.[2]   However, even assuming,

23   arguendo, that these claims were not procedurally barred, they must nevertheless be denied on

24   their merits.

25

26

27   [2] Respondent correctly notes that the portion of Ground Four that raises ineffective
     assistance of counsel is not procedurally barred. <u>In re Robbins</u>, 18 Cal.4th at 814 n. 34 (declining
28   to apply the <u>Dixon</u> bar to an ineffective assistance of trial counsel claim).

**IV.  Petitioner's Substantive Claims Should Be Denied.[3]**

The petition alleges the following grounds for relief:

| | |
|---|---|
| **Ground One** | **Ineffective Assistance Of Trial And Appellate Counsel In Failing To Prevent The State Court From Instructing The Jury With CALJIC No. 17.41.1.** |
| **Ground Two** | **Insufficient Evidence Was Presented To Support Petitioner's Conviction For Robbery** |
| **Ground Three** | **Mistaken Identity** |
| **Ground Four** | **Failure To Provide Petitioner With A Timely Line-Up** |

$$ * \quad * \quad * \quad * \quad * \quad * \quad * \quad * $$

| | |
|---|---|
| **Ground One** | **Ineffective Assistance Of Trial And Appellate Counsel In Failing To Prevent The State Court From Instructing The Jury With CALJIC No. 17.41.1** |

Petitioner argues that his trial and appellate counsel failed to provide him with effective assistance because trial counsel failed to "protect" Petitioner's constitutional rights of due process and equal protection by allowing the trial court to instruct the jury  pursuant to CALJIC No. 17.41.1, and because appellate counsel refused to raise the issue on appeal of trial counsel's purported ineffectiveness.  (Doc. 1, p. 5).  This contention is without merit.

As a preliminary matter, the Court notes that in his direct appeal, Petitioner did challenge the propriety of instructing the jury with CALJIC No. 17.41.1.  (Doc. 18, Exh. A).  However, he never raised the issue of the ineffectiveness of either trial or appellate counsel to prevent the jury from being instructed with the challenged instruction, and the state courts never addressed the claim as an ineffective assistance argument.  In his state habeas petitions, Petitioner never raised the issue of either the propriety of instructing the jury with CALJIC No. 17.41.1 or his attorneys'

---

[3] Here, because the state court provided no reasoning for its decision other than procedural default, the Court independently reviews the record to determine whether under the AEDPA,  the state court properly denied habeas relief, focusing on whether the state court's resolution of Petitioner's claim was an unreasonable application of clearly established federal law. See Greene v. Lambert, 288 F. 3d at 1088-1089; Delgado, 223 F.3d at 981-982.

1  ineffectiveness in failing to prevent the instruction from being given.  Respondent has briefed

2  and argued the issue not as ineffective assistance but as a direct challenge to the instruction itself.

3  The Court will not be so creative in these Findings and Recommendations.  The Court will,

4  instead, address the argument as Petitioner has framed it, i.e., as a claim of ineffective assistance

5  of counsel.  In so doing, the Court rejects the contention as being without merit.

6        1.  Ineffective Assistance of Trial Counsel

7        In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the Court

8  must consider two factors.  Strickland v. Washington, 466 U.S. 668, 687 (1984); Lowry v. Lewis,

9  21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was

10 deficient, requiring a showing that counsel made errors so serious that he or she was not

11 functioning as the "counsel" guaranteed by the Sixth Amendment.  Strickland, 466 U.S. at 687.

12 To establish this, the petitioner must show that counsel's representation fell below an objective

13 standard of reasonableness.  Id. at 688.  The petitioner must identify counsel's alleged acts or

14 omissions that were not the result of reasonable professional judgment considering the

15 circumstances.  Id.; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).

16 Judicial scrutiny of counsel's performance is highly deferential, and a court indulges a strong

17 presumption that counsel's conduct falls within the wide range of reasonable professional

18 assistance.  Strickland, 466 U.S. at 687; Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994).

19      Second, petitioner must show prejudice, i.e., whether counsel's errors were so egregious

20 as to deprive him of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688, 694.

21 To establish prejudice, petitioner "must show that there is a reasonable probability that, but for

22 counsel's unprofessional errors, the result of the proceeding would have been different.  A

23 reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id.;

24 Williams v. Taylor, 529 U.S. at 391.  In so doing, the Court must also evaluate whether the entire

25 trial was fundamentally unfair or unreliable because of counsel's ineffectiveness.  Id.; United

26 States v. Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1456, 1461 (9th

27 Cir. 1994).

28 ///

The Court does not need to consider the two elements in any particular order, nor does the Court need to consider both if the showing on either one is insufficient. Strickland, 466 U.S. at 697. A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Id. The object of an ineffectiveness claim is not to grade counsel's performance. Id. "If it is easier to dispose of an ineffective claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id.

Petitioner contends that his trial counsel failed to provide effective assistance because he "allowed" the trial court to improperly instruct the jurors pursuant to CALJIC No. 17.41.1. Because Petitioner has met neither prong of the Strickland test, this contention lacks merit.

First, Petitioner has not established that his trial attorney's conduct in "permitting" the jury to be instructed with CALJIC No. 17.41.1 was deficient. The jury was instructed at trial with CALJIC No. 17.41.1 as follows:

> The integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves as required by these instructions. Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or to decide the case based on penalty or punishment, or any other improper basis, it is the obligation of the other jurors to immediately advise the Court of the situation. (CT 84).

In order for trial counsel's conduct to be deficient vis-a-vis CALJIC No. 17.41.1, the giving of that instruction must, in some fashion, have been wrongful. Generally, the issue of whether a jury instruction is a violation of state law is neither a federal question nor a proper subject for habeas corpus relief. Estelle v. McGuire, 502 U.S. 62, 68 (1991). Thus, normally, a claim that challenges the propriety of a jury instruction under state law cannot reasonably be construed to allege a deprivation of federal rights. Van Pilon v. Reed, 799 F.2d 1332, 1341-1342 (9th Cir. 1986). Moreover, federal courts are bound by state court rulings on questions of state law. See Oxborrow v. Eikenberry, 877 F.2d 1395, 1399 (9th Cir. 1989).

On February 1, 2000, the California Court of Appeal decided People v. Engelman, 77 Cal.App.4th 1297 (2000), in which the Court upheld a jury verdict where the jury was instructed with CALJIC No. 17.41.1. On April 26, 2000, the California Supreme Court granted

1  a petition for review in Engelman and agreed to review the issue. Petitioner's trial was held in

2  June 2000.  Two years later, in People v. Engelman, 28 Cal.4th 436, 439-444 (2002), the

3  California Supreme Court held that CALJIC No. 17.41.1, "Does not infringe upon defendant's

4  federal or state constitutional right to trial by jury or his state constitutional right to a unanimous

5  verdict...."  However, the California Supreme Court in Engelman also directed state trial courts

6  not to give CALJIC No. 17.41.1 in the future based on the Court's concern that the instruction

7  "has the potential to intrude unnecessarily on the deliberative process and affect it adversely–both

8  with respect to the freedom of jurors to express their differing views during deliberations, and the

9  proper receptivity they should accord the views of their fellow jurors." Engelman, 28 Cal.4th at

10  440-441, 449.  In so holding, the California Supreme Court concluded that the instruction did not

11  violate the defendant's Sixth Amendment right to a jury trial because the constitutional right does

12  not require "absolute and impenetrable secrecy for jury deliberations in the face of an allegation

13  of juror misconduct," or "constitute [ ] an absolute bar to jury instructions that might induce

14  jurors to reveal some element of their deliberations." Id. at 443.

15      Any habeas claim directly challenging CALJIC No. 17.41.1 is foreclosed by the Ninth

16  Circuit's decision in Brewer v. Hall, 378 F.3d 952, 955-957 (9th Cir. 2004), in which the Ninth

17  Circuit held that, regardless of the "constitutional merits" of CALJIC No. 17.41.1, habeas corpus

18  relief was unavailable because there is "no Supreme Court precedent clearly establishing" that

19  use of this jury instruction violates a defendant's constitutional rights. Id. at 955-956.  Here, as

20  in Brewer, Petitioner has "pointed to no Supreme Court precedent clearly establishing that

21  CALJIC 17.41.1–either on its face or as applied to the facts of his case–violated his

22  constitutional rights." Id. at 957.  Absent such a "clearly established" federal law, the Court has

23  no basis for either finding or concluding that the California courts' rejection of Petitioner's claim

24  either was contrary to or involved an unreasonable application of clearly established Supreme

25  Court law.  28 U.S.C. § 2254(d)(1).

26      Even were that not the case, the Court would necessarily have to conclude that the

27  instruction does not impinge on the ability of each juror to deliberate independently and reach

28  their own verdict.  The instruction does not require that each word uttered in deliberations be

20

1   reported or that holdout jurors be singled out and reported to the trial judge.  Rather, the

2   instruction attempts to ensure the proper functioning of the jury by enabling the trial court to

3   investigate jury misconduct when necessary.  The instruction on its face does not misstate the

4   law.  A juror may not refuse to deliberate, may not disregard the law, and may not decide the case

5   by relying on an improper basis.

6        The contention that the instruction chills the "independent" deliberations of jurors by

7   forcing jurors to essentially police one another is both abstract and speculative.  (Doc. 18, Exh.

8   A, pp. 8-9).  The instruction only authorizes the jury to report a juror who is refusing to

9   deliberate or follow instructions, not a juror who is simply dissenting from the majority.  If jurors

10  were to report a juror to the court simply on the basis of dissenting, the jurors would not be

11  following the instruction as written, as they are presumed to do.  See Aguilar v. Alexander, 125

12  F.3d 815, 820 (9th Cir. 1997).  Moreover, the instruction contains no suggestion that jurors who

13  disagree with other jurors will be punished or suffer negative consequences.  While a reasonable

14  juror might infer from the instruction that the trial court would investigate any reports of

15  misconduct, it would be unreasonable for such jurors to also infer that the trial court would in

16  some fashion mete out punishment to jurors without first fully investigating such allegations to

17  ensure that they were well-founded.

18       Petitioner's claim that the instruction deprived him of his right of jury nullification is

19  equally unavailing.  (Doc. 18, Exh. A, p. 15).  Jury nullification may be a reality in the

20  courtroom, but it is not a right under the Constitution, laws, or treaties of the United States.  See

21  Crease v. McKune, 189 F.3d 1188, 1194 (10th Cir. 1999)(noting no right to jury nullification in

22  the context of federal habeas review);  cf. United States v. Powell, 955 F.2d 1206, 1213 (9th Cir.

23  1992)(federal defendants are not entitled to jury nullification instructions).[4]  Petitioner has not

24  cited any Supreme Court authority for the proposition that he has a federal constitutional right to

25

26  _____

27       [4]In California, jurors have the ability to nullify or disregard the court's instructions and
    evidence, and to return a verdict contrary to the law and the evidence, but they have no right of
    nullification regarding the applicable legal principles which govern their role as factfinders.
28  People v. Williams, 25 Cal.4th 441, 454 (2001).

21

1  jury nullification, much less to an instruction to the jury itself that it may disregard the law in its

2  deliberations.  Accordingly, there is not, in this regard, any clearly established federal law for the

3  state court's decision either to contradict or to unreasonably apply.

4         In the absence of any Supreme Court precedent to the contrary, the giving of CALJIC

5  No. 17.41.1 was not a violation of "clearly established Federal law, as determined by the

6  Supreme Court of the United States."  28 U.S.C.§ 2254(d)(1); Brewer, 378 F.3d 952.

7         Because the instruction was not a violation of Petitioner's constitutional rights, any

8  argument that trial counsel was deficient in failing to prevent the court from giving the

9  instruction is without merit.  First, trial counsel had no final control over whether the state court

10  gave the instruction.  Trial counsel could certainly have *objected* to the giving of the instruction,

11  although the prevailing case law at the time of trial, as embodied in the Court of Appeal's

12  decision in Engelman, upheld the instruction, and therefore, any such objection would likely have

13  been deemed without merit and overruled.  The California Supreme Court's recommendation

14  that the instruction not be given in the future was not even made until two years after the trial.

15         The Strickland standard does not require trial counsel to be prescient.  In deciding

16  whether to object to proffered instructions, trial counsel could only rely on the state of the law at

17  the time of trial, which indicated that the instruction was legal but that the California Supreme

18  Court had agreed to review the issue.  Under such circumstances, trial counsel's conduct in not

19  "preventing" the jury from being instructed with CALJIC No. 17.41.1 was not deficient under

20  Strickland.

21         However, even if it were, Petitioner was not prejudiced under Strickland.   In order to be

22  entitled to federal habeas corpus relief, Petitioner must show that CALJIC No. 17.41.1 by itself

23  so infected the entire trial that the resulting conviction violated due process.  See Estelle, 502

24  U.S. at 72.  Petitioner has not done so, nor has he shown that there is a "reasonable likelihood"

25  that the jury applied the instruction in a manner that violated the Constitution.  See id.  In light of

26  the record in this case, the Court has no basis for finding or concluding that the giving of the

27  instruction had a substantial and injurious effect or influence in determining the jury's verdict.

28  See Brecht v. Abrahamson, 507 U.S. 618, 637 (1993).  Considered as a whole, the instructions

1  given to the jury accurately stated the law and advised the jurors that it was their duty to decide

2  the case based on their individual opinions.

3       Petitioner's implicit allegations regarding the *hypothetical* effect of the challenged

4  instruction on jury deliberations are conclusory and unsupported by the record, and thus remain

5  just that - *hypothetical* effects that were never realized.  Conclusory allegations do not warrant

6  habeas relief.  See Jones v. Gomez, 66 F.3d 199, 204-205 (9th Cir.1995)(conclusory allegations

7  made with no reference to the record or any document do not merit habeas relief).  Petitioner's

8  appellate counsel was unable to articulate any specific injury that was attributable to the

9  instruction.  (Doc. 18, Exh. A).  Nor has Petitioner pointed to any action on the part of the jury

10 which would suggest that the instruction so infected the entire trial so that his conviction violates

11 due process.  Indeed, there is no indication in this record that any problems even arguably

12 attributable to the giving of CALJIC No. 17.41.1 (e.g., jury deadlock, conflicts regarding holdout

13 jurors, refusal to follow the law, stifled deliberations, or intrusion by the trial judge into the

14 deliberative process), occurred during jury deliberations.

15      Based on the foregoing, the Court concludes that the state court resolution of this claim

16 was not contrary to clearly established federal law, as determined by the Supreme Court of the

17 United States in Strickland, nor did the state court resolution result in a decision that was based

18 on an unreasonable determination of the facts in light of the evidence presented.  See 28 U.S.C.

19 § 2254(d).  Accordingly, the Ground One must be denied as to trial counsel's purported

20 ineffectiveness.

21      2.  Ineffective Assistance of Appellate Counsel

22      In challenges to the effective assistance of appellate counsel, the same standards apply as

23 with the claims of ineffective assistance of trial counsel.  Smith v. Robbins, 528 U.S. 259, 285

24 (2000); Smith v. Murray, 477 U.S. 527 (1986).   In Smith, the United States Supreme Court

25 indicated that an appellate attorney filing a merits brief need not and should not raise every

26 non-frivolous claim.  Robbins, 528 U.S. at 288.  Rather, an attorney may select from among them

27 in order to maximize the likelihood of success on appeal.  Id.  As a result, there is no

28  requirement that an appellate attorney raise issues that are clearly untenable.  Gustave v. United

1   States, 627 F.2d 901, 906 (9th Cir. 1980).

2       In the preceding section, this Court concluded that trial counsel's performance was not

3   deficient and that Petitioner had not been denied the effective assistance of trial counsel based on

4   the trial court's decision to instruct the jury pursuant to CALJIC No. 17.41.1.  Since Petitioner's

5   ineffectiveness claim for appellate counsel is based on his purported failure to address

6   deficiencies in trial counsel's performance that simply do not exist, there is no legitimate basis

7   for a claim of ineffective assistance on the part of appellate counsel.  Featherstone v. Estelle, 948

8   F.2d 1497, 1507 (9th Cir. 1991).

9       Accordingly, Petitioner has failed to show that the state court's adjudication of this issue

10  was contrary to or an unreasonable application of clearly established federal law.  Thus, Ground

11  One should be denied in its entirety.

12
    **Ground Two**            **Whether Petitioner's Constitutional Rights Were Violated By**
13                            **The State Court's Exclusion of Petitioner's Testimony About**
                              **His 1986 Plea Agreement**
14

15  **Ground Three**          **Mistaken Identity**

16      Petitioner argues in Ground Two that insufficient evidence was presented to "support" the

17  allegations of the witnesses, presumably regarding the substantive charge of robbery.  (Doc. 1, p.

18  5).  Petitioner also contends, in Ground Three, that "witnesses recollection and description given

19  to police has been an issue totally ignored by the court."  (Id., p. 6).  Because both Ground Two

20  and Ground Three appear to be based upon the sufficiency of the evidence to convict him, the

21  Court will address both Grounds together.

22      1.  Standard of Review For Sufficiency of the Evidence

23      The law on sufficiency of the evidence is clearly established by the United States

24  Supreme Court.  Pursuant to the United States Supreme Court's holding in Jackson v. Virginia,

25  443 U.S. 307 (1979), the test on habeas review to determine whether a factual finding is fairly

26  supported by the record is as follows:

27  ///

28  ///

1    "[W]hether, after viewing the evidence in the light most favorable to the
     prosecution, any rational trier of fact could have found the essential elements of
2    the crime beyond a reasonable doubt."

3    Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).  Thus, only if "no

4    rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner

5    be entitled to habeas relief.  Jackson, 443 U.S. at 324.  Sufficiency claims are judged by the

6    elements defined by state law.  Id. at 324, n. 16.[5]

7         It appears to be an open question in the Ninth Circuit whether the AEDPA adds a second

8    level of deference to this standard, so that a federal habeas petitioner may obtain relief only by

9    demonstrating that the state court's adjudication on the merits of the claim involved an

10   unreasonable application of Jackson's "no rational trier of fact" standard.  See Garcia v. Carey,

11   395 F.3d 1099, 1102 (9th Cir. 2005); Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir. 2004)(en

12   banc).  However, the Court here need not address that issue because the Court reaches the same

13   result whether the record is reviewed directly under Jackson or under the more deferential filter

14   of the AEDPA standard.

15        This Court must presume the correctness of the state court's factual findings. 28 U.S.C.

16   § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).  This presumption of correctness

17   applies to state appellate determinations of fact as well as those of the state trial courts.  Tinsley

18   v. Borg, 895 F.2d 520, 525 (9th Cir.1990).  Although the presumption of correctness does not

19   apply to state court determinations of legal questions or mixed questions of law and fact, the facts

20   as found by the state court underlying those determinations are entitled to the presumption.

21   Sumner v. Mata, 455 U.S. 591, 597 (1982).

22        2.  Sufficient Evidence Was Presented on The Charge of Robbery

23            a.  The Elements of Robbery

24        In California, robbery is the felonious taking of personal property in the possession of

25   another, from his person or immediate presence, and against his will, accomplished by means of

26   _____

27        [5]In reviewing sufficiency of evidence claims, California courts expressly follow the
     standard enunciated in Jackson.  See People v. Johnson, 26 Cal.3d 557, 575-78 (1980); see also
28   People v. Thomas, 2 Cal.4th 489, 513 (1992).

1  force or fear.  (Pen. Code § 211).[6]  The specific intent required for robbery is the intent to

2  permanently deprive.  <u>People v. Dominguez</u>, 38 Cal.App.4th 410, 417 (1995); <u>see People v.</u>

3  <u>Wader</u>, 5 Cal.4th 610, 645-46 (1993); <u>People v. Cummings</u>,  4 Cal.4th 1233, 1311-12 n. 53

4  (1993).   Put another way, the crime of robbery is essentially a theft with two aggravating factors:

5  a taking (1) from a victim's person or immediate presence, and (2) accomplished by the use of

6  force or fear.  <u>Miller v. Superior Court</u>, 115 Cal.App.4th 216, 221 (2004).

7          The "taking" element of robbery has two necessary elements, i.e., gaining possession of

8  the victim's property and transporting or carrying away the loot.  <u>People v. Cooper</u>, 53 Cal.3d

9  1158, 1165 (1991).  "Immediate presence" is spatially, not temporally descriptive and thus

10  'refer[s] to the area from which the property is taken, not how far it is taken" or for what

11  duration.  <u>Miller</u>, 115 Cal.App. 4th  at 221; <u>Cooper</u>, 53 Cal.3d at 1165.  A store employee may be

12  the victim of a robbery even though he or she is not its owner and not at the moment in

13  immediate control of the stolen property.  <u>People v. Miller</u>, 18 Cal.3d 873, 889 (1974), <u>overruled</u>

14  <u>on other grounds</u> <u>People v. Oates</u>, 32 Cal.4th 1048, 1067-68, n. 8 (2004).

15                     b.  <u>Sufficient Evidence Was Presented To Support A Conviction</u>

16          In this case, sufficient evidence was presented upon which a reasonable juror could have

17  found that Petitioner committed the substantive offense of robbery.  Without repeating all of the

18  facts set forth in the Statement of Facts, <u>supra</u>, the State's evidence can be summarized as

19  follows: Petitioner convinced Wiggins to give him a ride to the gas station on the pretext that he

20  was going to see his wife to get some money; while Wiggins waited in her car, Petitioner

21  approached the gas station cashier, Cortez, threatened her with a handgun, demanded money, and

22  took the money from her.  Petitioner then returned to Wiggins' car and ordered her to drive him

23  back to where she had first picked him up.  For the next ninety minutes, Wiggins was a virtual

24  prisoner of Petitioner as he forced Wiggins to accompany him first to an apartment and then

25  outside the apartment, where he eventually allowed her to go.  Both Cortez and Wiggins testified

26  that they knew Petitioner had a weapon, were scared of him, and did what he told them because

27  _____

28          [6]The jury was instructed with CALJIC No. 9.40 as to the elements of robbery.  (CT 73.)

of that fear.  Also, both women positively and unequivocally identified Petitioner as the man

involved in the robbery.

From the foregoing, it is patent that sufficient evidence was presented from which a

reasonable juror could have concluded beyond a reasonable doubt that Petitioner had committed

all of the elements of the offense of robbery with the personal use of a handgun.

Petitioner's argument vis-a-vis sufficiency of the evidence emphasizes the purported

discrepancies between the eyewitnesses' testimony and their prior descriptions of Petitioner to

police, discrepancies that Petitioner implicitly contends give rise to a reasonable doubt regarding

his involvement.   However, construing the evidence in the light most favorable to Petitioner is

not the appropriate prism for the Court to employ in determining whether sufficient evidence was

presented to satisfy constitutional principles.  Rather, Jackson cautions reviewing courts to

consider the evidence "in the light most favorable to the prosecution."  Jackson, 443 U.S. at 319.

If confronted by a record that supports conflicting inferences, federal habeas courts "must

presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any

such conflicts in favor of the prosecution, and must defer to that resolution.  Id. at 326.  Thus, a

jury's credibility determinations are entitled to near-total deference under Jackson.  Bruce v.

Terhune, 376 F.3d 950, 957 (9th Cir. 2004); see Schlup, 513 U.S. at 330 ("[U]nder Jackson, the

assessment of the credibility of witnesses is generally beyond the scope of review."); see also

United States v. Brady, 579 F.2d 1121, 1127 (9th Cir. 1978)(explaining that, in applying Jackson

test for sufficiency of the evidence, "it is the exclusive function of the jury to determine the

credibility of the witnesses, resolve evidentiary conflicts and draw reasonable inferences from

proven facts"); United States v. Ramos, 558 F.2d 545, 546 (9th Cir. 1977) ("[T]he reviewing

court must respect the exclusive province of the jury to determine the credibility of witnesses,

resolve evidentiary conflicts, and draw reasonable inferences from proven facts, by assuming that

the jury resolved all such matters in a manner which supports the verdict.").

Petitioner asks this Court, essentially, to re-assess the credibility of the eyewitnesses, in

direct contravention of the authority discussed above.  The Court declines to do so.  Petitioner's

attorney had ample opportunity to cross-examine the prosecution's witnesses regarding their

credibility, as well as the consistency and plausibility of their identification of Petitioner. Moreover, trial counsel also had the opportunity to argue any purported inconsistencies and defects in the prosecution's case to the jury if he so desired.  Finally, the jury was properly instructed in how to consider and weigh all of the evidence presented, including general witness credibility instructions (CT 66, 67), a lengthy instruction regarding how to evaluate eyewitness identifications (CT 78), instructions on the elements of the offense of robbery (CT 73), and the instruction on the prosecution's burden of proof (CT 69).

Based on the foregoing, the Court concludes that the state court's decision rejecting Petitioner's claim of insufficient evidence as to attempted murder was not contrary to nor an unreasonable application of clearly established federal law.  Accordingly, Grounds Two and Three must be rejected.    _____

**Ground Four          Failure To Provide Petitioner With A Timely Line-Up**

Finally, Petitioner argues that he was deprived of a timely line-up in violation of his due process rights.  (Doc. 1, p. 6).  Specifically, Petitioner contends that he "had a due process right to have a line-up conducted in a timely manner, upon his request but was denied this right by the court and his trial counsel."  (Doc. 1, p. 6).  This contention is likewise without merit.

Prior to trial, defense counsel filed a motion for a lineup.  (CT 38).  The motion alleged that differences between the descriptions of Petitioner given by Ashby, Cortez, and Wiggins justified a lineup procedure rather than the showup that had previously been used to identify Petitioner.  (CT 40).   Based on the limited amount of time Cortez had to observe Petitioner, the trial court granted the motion as to her.  (RT 4; CT 43).  However, as to Wiggins, the Court denied the motion, apparently because the evidence at the preliminary hearing indicated that Wiggins had a much greater amount of time and a much better opportunity to observe Petitioner and to make her identification.  (RT 3; CT 43).[7]

_____

[7]Although the motion for lineup also mentioned Ashby, the motion requested only that "each witness should view defendant in a live lineup prior to the court identification."  (CT 41). Ashby was not mentioned in the trial court's order regarding Petitioner's motion presumably

Three days after the motion hearing, the court issued a minute order vacating the lineup. (CT 44).  The Superior Court's order denying Petitioner's state petition indicates that the motion had been withdrawn by defense counsel for tactical reasons.  (Doc. 18, Exh. H).  However, the May 25, 2003 minute order vacating the lineup does not state any reason.  Petitioner submitted exhibits with his state petition (Doc. 18, Exh. G), which contain a transcript of a Marsden hearing conducted in this case in which defense counsel indicated that he had drafted the motion for a lineup but that after the trial court granted it only as to Cortez, Petitioner was dissatisfied with that ruling and thereafter defense counsel asked the prosecutor not to proceed with the lineup.  (Doc. 18, Exh. G, Exhs. A and D to Exh. G).

Regarding Ground Four, the United States Supreme Court has never held a criminal defendant has a constitutional right to a pretrial lineup.  The ninth Circuit explicitly has rejected any constitutional dimension to a defendant's request for a pretrial lineup.  United States v. Robertson, 606 F.2d 853, 858 (9th Cir. 1979) ("An accused has no absolute or constitutional right to a lineup.); see also Sims v. Sullivan, 867 F.2d 142, 145 (2d Cir. 1989); Bond v. Walker, 68 F.Supp.2d 287, 299-301 & n. 6 (S.D.N.Y. 1999).  Accordingly, the state court's rejection of this claim was not an unreasonable application of clearly established law.

Moreover, an identification procedure violates a defendant's right to due process only if it is so unreliable that it produces a "very substantial likelihood of irreparable misidentification."  Manson v. Brathwaite, 432 U.S. 98, 116 (1977).  Indeed, even if police engaged in suggestive procedures, the identification is still admissible if it is reliable.  Id. at 114 ("reliability is the linchpin in determining the admissibility of identification testimony").

Here, defense counsel cross-examined each of the two eyewitnesses extensively on their ability to describe, remember, and identify Petitioner as the person who robbed the gas station.  Although defense counsel was able to elicit only slight variations in the descriptions of Cortez and Wiggins, and although both Wiggins and Cortez testified that they were sure of their

---

because Ashby never identified Petitioner at trial and thus a lineup was unnecessary.

1    identification, defense counsel was able to elicit that Ashby, the third eyewitness, was unable to

2    identify Petitioner.

3        In none of the state court petitions in this record or in the instant petition has Petitioner

4    identified precisely how any of the pretrial identification procedures would have violated his

5    constitutional right to due process.  Nor, as mentioned above, has he established any

6    constitutional right to a pretrial lineup.  Finally, Petitioner has not shown that the trial court

7    abused its discretion in denying the motion as to Wiggins or, later, in vacating the order for a

8    lineup at the request of defense counsel.  Indeed, the record appears clear that his attorney

9    withdrew the request for a lineup as a result of Petitioner's own dissatisfaction with the trial

10   court's order excluding Wiggins from the lineup.  Therefore, the Court concludes that the state

11   court's adjudication of this issue was not contrary to nor an unreasonable application of clearly

12   established federal law.

13       That conclusion, however, does not end the matter since Petitioner has also claimed that

14   he was denied his constitutional right to a lineup not only by the trial court but also by his own

15   counsel.  (Doc. 1, p. 6).  Respondent interprets this as an argument for ineffective assistance of

16   trial counsel.  Although such an interpretation is far from obvious, assuming that Respondent is

17   correct, the claim of ineffectiveness must nevertheless be rejected as well.

18       Petitioner has established neither deficient conduct nor prejudice.  A claim of

19   ineffectiveness based on the attorney's purportedly depriving his client of his constitutional right

20   to a pretrial lineup must necessarily fail because, as mentioned, there is no constitutional right to

21   such a lineup.

22       Moreover, the last reasoned state court decision was that of the Superior Court, which

23   found that the motion had been withdrawn for tactical reasons by the defense attorney.  Although

24   the reasonableness of counsel's actions is best described as a question of law, whether his actions

25   were in fact "tactical" is a question of fact.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir.

26   2007).  Therefore, the Court must initially decide whether the state court made an unreasonable

27   determination of the facts in light of the evidence before it.  Id.; Taylor v. Maddox, 366 F.3d 992,

28

1  999-1000 (9th Cir. 2004).

2        The transcript of the <u>Marsden</u> hearing appended to Petitioner's own court filings indicates

3  that trial counsel voluntarily withdrew the motion based in part upon Petitioner's own

4  dissatisfaction with the trial court's ruling that a pretrial lineup was warranted as to Cortez but

5  not as to Wiggins.  Petitioner's attorney advised the district attorney not to proceed with the

6  lineup that the court had previously ordered as to Cortez.  The state court considered this move

7  "tactical," and nothing in the record suggests otherwise.  Certainly, Petitioner has not pointed to

8  any other possible explanation for his own attorney's withdrawal of the request.  Accordingly,

9  the Court concludes that the state court's finding that defense counsel's actions were "tactical"

10  was not an unreasonable factual determination.

11        The next question is whether the tactical decision itself was reasonable.  <u>Edwards</u>, 475

12  F.3d at 1127.  In evaluating the reasonableness of counsel's actions, a reviewing court must

13  consider the circumstances at the time of counsel's conduct, <u>Strickland</u>, 466 U.S. at 690, and

14  cannot "second-guess" counsel's decisions or view them under the "fabled twenty-twenty vision

15  of hindsight." <u>LeGrand v. Stewart</u>, 133 F.3d 1253, 1272 (9th Cir. 1998).

16        Here, the record indicates that defense counsel was, in part, reacting to Petitioner's own

17  displeasure with having a pretrial lineup that involved only Cortez and not Wiggins.  Counsel

18  had indicated that he believed Wiggins had "credibility issues" and that her version of events

19  "doesn't make sense." (Doc. 18, Exh. G).  Thus, the motion for a lineup may have been primarily

20  directed at Wiggins, the witness with the greater opportunity to observe Petitioner and who could

21  therefore be the most damaging witness to the defense at trial, rather than Cortez, who had a

22  much briefer opportunity to observe Petitioner and whose own identification could thus be more

23  successfully attacked on cross-examination without the need for a lineup.  Indeed, a lineup

24  involving only Cortez could have had the opposite effect of serving to reinforce Cortez's

25  memory and identification of Petitioner by giving her a second opportunity to observe him before

26  trial.

27        Thus, objectively reasonable bases existed for defense counsel to abandon his request for

28  a lineup and to pursue Wiggins's  "credibility issues" primarily through cross-examination at

1  trial.  Under these circumstances, and giving proper deference to the state court's adjudication of

2  this issue, the Court cannot say that this adjudication was an objectively unreasonable application

3  of Strickland to the facts of this case.  Hence, this facet of Ground Four must also be denied.

4  **RECOMMENDATIONS**

5  Accordingly, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus

6  (Doc. 1), be DENIED.

7  These Findings and Recommendations are submitted to the United States District Judge

8  assigned to this case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 72-304 of

9  the Local Rules of Practice for the United States District Court, Eastern District of California.

10  Within twenty (20) days after being served with a copy, any party may file written objections

11  with the court and serve a copy on all parties.  Such a document should be captioned "Objections

12  to Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served

13  and filed within ten (10) court days (plus three days if served by mail) after filing of the

14  objections.  The District Judge will then review the Magistrate Judge's ruling pursuant to

15  28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the

16  specified time may waive the right to appeal the District Judge's order.  Martinez v. Ylst, 951

17  F.2d 1153 (9th Cir. 1991).

18

19  IT IS SO ORDERED.

20  Dated:   **August 29, 2007**                    _____**/s/ Theresa A. Goldner**_____
   _____                                        UNITED STATES MAGISTRATE JUDGE

21

22

23

24

25

26

27

28